# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-01355-SCT

*SRHS AMBULATORY SERVICES, INC.*

*v.*

*PINEHAVEN GROUP, LLC, AND FIRST AMERICAN TITLE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/13/2020 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS, JR. |
| TRIAL COURT ATTORNEYS: | PATRICK R. BUCHANAN |
| | MICHAEL E. BRUFFEY |
| | CHARLES JONES SWAYZE, III |
| | HENRY DONALD BROCK, JR |
| | G. DEWEY HEMBREE, III |
| | ROY D. CAMPBELL, III |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL JAMES BENTLEY |
| | MICHAEL E. BRUFFEY |
| | CHRISTINA MARIA SEANOR |
| | STEVIE FARRAR RUSHING |
| | PATRICK R. BUCHANAN |
| ATTORNEYS FOR APPELLEES: | CHARLES JONES SWAYZE, III |
| | G. DEWEY HEMBREE, III |
| | CHARLES J. SWAYZE, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 07/21/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. This appeal stems from the Harrison County Circuit Court's grant of summary judgment to First American Title Company (First American) and its grant of a declaratory

judgment to Pinehaven Group, LLC (Pinehaven), against Singing River Health System Ambulatory Services (AS). Singing River Health System (SRHS) informed AS that its real estate purchase from Pinehaven ten years before was void for lack of ratification by the Jackson County Board of Supervisors (the board). AS sought to void the purchase and to recover from Pinehaven and First American. The circuit court held that AS's purchase from Pinehaven was valid and enforceable.

## FACTS AND PROCEDURAL HISTORY

¶2.     SRHS is a county-owned community hospital that created AS in 1998 as a Mississippi nonprofit corporation. AS is governed by its own board of directors and is authorized to acquire and own real property.

¶3.     AS entered into contract with Pinehaven to acquire a twelve-acre tract of land with road frontage on Highway 67 near D'Iberville, Mississippi for the purchase price of $3.6 million.

¶4.     SRHS is the sole member of AS. On July 25, 2007, the SRHS trustees voted to support AS's purchase of the property, to authorize appropriation, and to transfer $50,000 to AS, contingent upon AS's executing a contract with Pinehaven. The SRHS trustees' resolution determined that the appropriation would benefit the community.

¶5.     On July 30, 2007, the AS board of directors voted to enter into contract. On August 28, 2007, Greg Shoemaker, in his capacity as AS president, executed the contract on behalf of AS to purchase the Pinehaven property.

2

¶6.    AS was granted a seventy-day due-diligence period for the purpose of making a final determination that the purchase of the land was in the best interest of AS. Pinehaven fully complied with the terms of the contract by delivering to AS written assurances of full compliance.

¶7.    On October 31, 2007, the SRHS trustees unanimously approved a second resolution appropriating the additional funds necessary to make the purchase. SRHS then issued a check to AS for the purchase price.

¶8.    In November 2007, shortly after the purchase contract was executed, the land appraised for only $3 million, about 17 percent less than what AS had paid. Even so, the parties closed the deal in December 2007.

¶9.    Pinehaven issued a warranty deed for the property to AS on December 18, 2007. First American issued an owner's policy insuring AS's title for $3.6 million against claims and defects, which became effective one day after the purchase price was paid.

¶10.   AS never developed the property, but it paid ad valorem taxes on the property. In the summer of 2013, AS listed the property for sale for $4.2 million but found no buyers. The property sat vacant and was still listed for sale as an empty lot in August 2018.

¶11.   In February 2015, William Guice, an attorney for the board advised SRHS that, based on his research, the attempted purchase of the Pinehaven property was invalid. Guice concluded that AS did not have title to the property. In June 2015, Guice shared his concerns

3

with the media and told the press that the property was illegally acquired and that AS should file suit to recover the purchase price.[1]

¶12.   In February 2017, two years after these comments, AS made a claim against its title insurance policy explaining that the purchase was void for lack of ratification by the board. AS requested that First American pay the policy amount and offered to assist First American in pursuing recovery from Pinehaven.  First American denied the claim, asserting that ratification by the board was not required, and, therefore, AS had valid title.  Even if ratification was required, First American invoked several policy exclusions to deny AS's insurance claim.

¶13.   In March 2017, AS filed suit solely against Pinehaven (while its insurance claim against First American was pending), seeking a declaration that its attempt to purchase the Pinehaven property was void for lack of ratification and, therefore, that Pinehaven had to refund the purchase price.  In June 2017, First American denied its insurance claim stating that no evidence of adverse claim to title existed and that certain exclusions of the policy applied.

¶14.   AS amended its complaint to assert a claim against First American for benefits owed under the title policy and damages caused by First American's negligence.  First American and Pinehaven both answered the amended complaint.  Pinehaven counterclaimed for a declaration of the parties' rights under the disputed purchase contract.

---

[1] Until then, AS never questioned its record ownership of the property and readily admits that no one has filed any legal challenge to its title. AS now claims that these public statements have rendered the property unmarketable.

4

¶15. AS filed a summary-judgment motion seeking a declaration that its attempt to purchase was void because the board never ratified the purchase. Pinehaven and First American opposed the motion as premature and requested a continuance for discovery. AS opposed the continuance, finding that it presented a pure question of law about whether the board had ratified the purchase.

¶16. The chancery court in which the case was pending at the time, never ruled on the motion to continue or AS's summary-judgment motion. The parties engaged in discovery over an eight-month period. The chancery judge sua sponte transferred the case to the circuit court, finding that the new claims in AS's amended complaint were better suited for circuit court resolution.

¶17. In circuit court, AS filed a revised summary-judgment motion arguing that AS's attempt to purchase was void for lack of ratification and that Pinehaven should be ordered to refund the purchase price. First American also filed a summary-judgment motion arguing the purchase was valid or, alternatively, that the title policy's exclusions barred coverage for AS's insurance claim. Pinehaven's earlier-filed motion for a declaratory judgment also remained pending.

¶18. In 2018, the circuit court conducted two hearings at which all pending motions were argued.[2] In June 2020, the circuit court held a status conference at which it announced that AS's summary-judgment motion was denied and that First American's summary-judgment motion was granted. The circuit court did not rule on Pinehaven's motion for declaratory

---

[2] During the pending litigation, a supplemental claim for coverage under the policy was submitted on January 12, 2018, and was denied on February 16, 2018.

5

judgment at the status conference but stated that it would be considered and ruled on later. The circuit court issued its final written orders in late 2020.

¶19. The court denied AS's summary-judgment motion. The court granted Pinehaven's motion for a declaratory judgment ruling that AS's purchase of the twelve-acre tract was valid and enforceable. It found no evidence of ratification by the board but also found that ratification had been unnecessary.

¶20. AS now appeals to this Court.

## STANDARD OF REVIEW

¶21. The circuit court resolved this case on motions for summary judgment and declaratory judgment. This Court applies a de novo standard when reviewing the grant or denial of summary judgment and declaratory judgments. *Double Quick, Inc. v. Moore*, 73 So. 3d 1162, 1165 (Miss. 2011); *S.C. Ins. Co. v. Keymon*, 974 So. 2d 226, 229 (Miss. 2008). A motion for summary judgment should be granted when no genuine issue of material fact that would necessitate a trial exists and when the moving party is entitled to judgment as a matter of law. Miss. R. Civ. P. 56.

## DISCUSSION

### I. Whether AS's purchase of the Pinehaven property was void for lack of ratification by the board of supervisors.

¶22. The Jackson County Board of Supervisors (the board) never ratified AS's purchase of the Pinehaven property for $3.6 million. The question before this Court is whether the lack of ratification rendered the purchase void.

6

¶23. AS relies on Mississippi Code Section 41-13-15(4), which provides that "[o]wners and boards of trustees, acting jointly or severally, may acquire and hold real estate for offices for physicians and other health care practitioners and related health care or support facilities, provided that any contract for the purchase of real property must be *ratified* by the owner . . . ." Miss. Code Ann. § 41-13-15(4) (Rev. 2018) (emphasis added).

¶24. AS commenced this litigation a decade after executing and finalizing the contract. AS contends that it could not act without the approval of its owner, the board, after SRHS provided it the funds to make the purchase.

¶25. First American contends that AS has never sought ratification from the board for any of its prior purchases. This contract does not even involve the board; it was a contract between AS and Pinehaven. Moreover, the board is not a party to this litigation.

¶26. Since AS's incorporation, it has bought, sold, and mortgaged numerous parcels of real property. AS holds interests in several pieces of real property, including abandoned buildings, fitness centers, and clinics. No evidence was offered by AS of ratification of any prior sales.

¶27. Chris Anderson, the former CEO of SRHS, testified that he never recalled going to the board for approval. Shoemaker testified that AS already owned interests in several parcels of land, and "it never entered my mind that I need[ed] to get ratification. I looked at my articles of incorporation" which "allowed us to buy property."

¶28. Daryl Dryden, closing attorney for AS, and Shoemaker concluded prior to closing that the contract to buy and purchase were properly authorized. According to the bylaws and

articles of incorporation, AS was permitted through its board of directors to enter into contracts in the name of and on behalf of the corporation in order to acquire property.

¶29. The circuit court agreed and held that no genuine issue of material fact was presented for the jury to consider. The court found that AS has purchased numerous parcels of property in its corporate name over the years. Deposition testimony confirmed that no prior consideration was given regarding the issue of ratification of these other purchases by the board. None of AS's other properties are the subject of this litigation nor has AS alleged that any of these other acquisitions should be voided.

¶30. We agree. The statute governing operations of boards of trustees of community hospitals, on which AS relies, is inapplicable. Mississippi Code Section 41-13-15(4) mandates owners' approval of a real estate transaction when the board of trustees of the community hospital "acquire[s]" property.

¶31. Here, the SRHS board of trustees was not acquiring the property; therefore, its owner, the board, was not required to ratify a purchase by AS. SRHS's board of trustees approved and financed AS's acquiring the property. AS's board of directors voted to enter into contract with Pinehaven for the purchase, and SRHS's trustees agreed in its meeting minutes to provide financial services to AS.

¶32. SRHS trustees approved in its resolutions the initial price needed to secure the property and the final price to complete the purchase. Therefore, AS's purchase was valid without ratification by the board because the board's approval was not required.

**CONCLUSION**

8

¶33.    Finding that no factual dispute that the contract was valid and enforceable exists, we decline to address the other issues presented on appeal that were based on the alleged ratification requirement. AS properly considered, approved, and executed the contract for its purchase of the Pinehaven property.  As such, we affirm the circuit court's decision that lack of ratification did not render the Pinehaven purchase void.

¶34.    **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION.  GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND MAXWELL, J.**

**KING, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶35.    While I do not join the dissent in this specific case, I am not convinced that Mississippi Code Section 41-13-15(4) (Rev. 2018) should never apply to AS or similarly situated entities; therefore I concur only in the result reached by the majority in this particular situation.  While I disagree with the dissent's conclusion, I find portions of its analysis of Section 41-13-15(4) persuasive.

**GRIFFIS, JUSTICE, DISSENTING:**

¶36.    The Jackson County Board of Supervisors (County) and its community hospital, Singing River Health Systems (SRHS) return to this Court in search of another economic and financial windfall simply because of their inability to follow proper public contracting practices. *See, e.g.*, ***Singing River MOB, LLC v. Jackson Cnty.***, No. 2019-IA-01630-SCT,

9

2021 WL 5371237 (Miss. Nov. 18, 2021)[3]; *Jackson Cnty. v. KPMG, LLP*, 278 So. 3d 1124 (Miss. 2019); *KPMG, LLP v. Singing River Health Sys.*, 283 So. 3d 662 (Miss. 2018).

¶37.　Most recently, in *Singing River MOB*, 2021 WL 5371237, at \*10, this Court ruled that, even though the County approved and recorded a property lease in the County's board of supervisors' minutes, the County and SRHS were able to void several property leases and obtain an economic and financial windfall of approximately $20 million of public financing simply because SRHS's board of trustees failed to record the property lease in its minutes.

¶38.　In this case, almost fourteen years after the purchase of real property, SRHS's subsidiary corporation, SRHS Ambulatory Services, Inc. (AS), seeks to void its purchase agreement with Pinehaven Group, LLC (Pinehaven), and asserts claims against its title insurance company, First American Title Insurance Company (First American), on the ground that the County did not "ratify" the purchase agreement as required by Mississippi Code Section 41-13-15(4) (Rev. 2018).　AS seeks the return of SRHS's $3.6 million paid to purchase the real property.

### 1.　The Real Estate Sale/Purchase Transaction

#### A.　Seller - Pinehaven Group, LLC

¶39.　Pinehaven was a Mississippi limited liability company formed in 2007.　Pinehaven purchased 1,200 acres of land in Jackson County.　Pinehaven marketed the property for sale.

#### B.　SRHS

---

[3] Singing River MOB's motion to stay mandate was granted on June 1, 2022.　The mandate is stayed pending Singing River MOB's application for writ of certiorari to the United States Supreme Court.　Order, *Singing River MOB, LLC v. Jackson Cnty., Miss.*, No. 2019-IA-01630 (Miss. June 1, 2022).

10

¶40.    SRHS is a community hospital.  SRHS is governed by the Mississippi community hospital laws, Mississippi Code Sections 41-13-10 to -53 (Rev. 2018).    SRHS's representatives entered negotiations with Pinehaven and ultimately agreed to the sale by Pinehaven of a twelve-acre tract of property for a purchase price of $3.6 million.

C.    *Buyer - AS*

¶41.    SRHS incorporated AS as a Mississippi nonprofit corporation to operate an ambulatory surgical facility.[4]  AS is owned by SRHS.  AS's articles of incorporation state that AS was "organized solely to operate for the benefit of, to perform the functions of and/or to carry out the purposes of [SRHS] and to acquire property, real, personal, or mixed, by purchase . . . or in trust for the benefit of [SRHS]."  The articles also state that "[t]he sole member of the corporation shall be Singing River Health System, a Mississippi community hospital."  AS's directors are appointed by SRHS's board of trustees.  AS's directors may be removed at will by SRHS's chief executive officer.  Also, upon dissolution, AS's assets revert to SRHS or to whatever charitable entity SRHS selects.

¶42.    AS's board of directors held a special meeting and learned that SRHS's board of trustees supported the acquisition of this property.  AS's board voted unanimously to enter a contract to purchase the property. The purchase contract was executed by Pinehaven and AS on July 26, 2007.  In October 2007, SRHS's board of trustees passed a resolution to approve AS's purchase and authorized the transfer of $3.6 million from SRHS to AS to pay the purchase price.  SRHS issued a check to AS for the $3.6 million purchase price.

---

[4]  An ambulatory surgery center is a healthcare facility that provides patients with surgical procedures outside of a hospital setting.

11

### D. Owner - Jackson County, Mississippi

¶43. The County created and owns SRHS. Thus, both SRHS's and AS's assets and liabilities belong to the County. The County did not participate in the transaction. The County did not approve, consent to, or ratify the purchase/sale agreement.

### E. The Closing

¶44. The sale and purchase of the twelve-acre tract was closed in December 2007. As the seller, upon receipt of the net sales proceeds, Pinehaven issued a warranty deed to convey the property to the buyer. AS was named as the buyer and was conveyed title to the property under the warranty deed. SRHS provided AS a check for $3.6 million to be used to purchase the property. First American issued an owner's policy that insured AS's title for $3.6 million against claims and defects.

### F. After the Closing

¶45. AS has held title to the property since closing, and AS is currently the title owner. The planned ambulatory surgical facility was not built on this property. In fact, AS sought to sell the property, but the market value of the property diminished, and AS was unable to sell the property.

¶46. According to AS's brief, the County identified this potential claim and asked AS to pursue this litigation:

> In February 2015, William Guice – an attorney for the Jackson County Board of Supervisors – advised SRHS Ambulatory [AS] that, based on his research, the attempted purchase of the Pinehaven property was invalid. Mr. Guice concluded that SRHS Ambulatory did not have title to the property. In June 2015, Mr. Guice shared his concerns with the media, and the Mississippi Free Press published his comments on the invalid title in a newspaper article.

12

> Fn. 5. Among Mr. Guice's concerns, as First American understood them, were that Singing River and SRHS Ambulatory did not comply with the requirement that real property be appraised before public funds are used for the purchase, Miss. Code § 43-37-3, and that the county had not given permission to purchase the Pinehaven property.

Mr. Guice told the press that the Pinehaven property was illegally acquired, and SRHS Ambulatory should file suit to recover the purchase price.

(Citations omitted.)

¶47. Thereafter, AS filed its complaint and commenced this litigation. Essentially, AS claims that it is a community hospital and that the Pinehaven transaction is void because SRHS and AS failed to follow the community hospital laws and obtain the County's ratification of the purchase agreement. Mississippi Code Section 41-13-15(4) (Rev. 2018) (emphasis added) provides:

> Owners and boards of trustees, acting jointly or severally, *may acquire and hold real estate* for offices for physicians and other health care practitioners and related health care or support facilities, *provided that any contract for the purchase of real property must be ratified by the owner*, and may thereon construct and equip, maintain and remodel or expand such offices and related facilities, and the board of trustees may lease same to members of the hospital staff or others at a rate deemed to be in the best interest of the community hospital.

¶48. It is undisputed that the County never ratified AS's purchase of the Pinehaven property *or* SRHS's expenditure of $3.6 million in public funds for the purchase. Maj. Op. ¶ 22. The majority has determined that AS did not violate Section 41-13-15(4) because this section "mandates owners' approval of a real estate transaction when the board of trustees

13

of the community hospital 'acquire[s]' property." Maj. Op. ¶ 30 (alteration in original). The

majority concluded:

> Here, the SRHS board of trustees was not acquiring the property;
> therefore, its owner, the Board, was not required to ratify a purchase by AS.
> SRHS's board of trustees approved and financed AS in acquiring the property.
> AS's board of directors voted to enter into contract with Pinehaven for the
> purchase, and SRHS's trustees agreed in its meeting minutes to provide
> financial services to AS.

Maj. Op. ¶ 31. I respectfully disagree and dissent.

### 2. *Standard of Review*

¶49. I agree with the majority that the facts are not in dispute. The motions before the

Court are based on Mississippi Rules of Civil Procedure 56(c) and 57. The only issues to be

decided on appeal are legal issues, which are to be reviewed de novo. *See Double Quick,*

*Inc. v. Moore*, 73 So. 3d 1162, 1165 (Miss. 2011); *S.C. Ins. Co. v. Keymon*, 974 So. 2d 226,

229 (Miss. 2008).

### 3. *As a matter of law, is AS a community hospital subject to Mississippi law governing community hospitals?*

¶50. The pivotal question is this case is whether AS is a community hospital. If AS is a

community hospital, then this real estate transaction required ratification by the County.

Miss. Code Ann. § 41-13-15(4).

### A. *Definition of a Community Hospital*

¶51. Mississippi Code Section 41-13-10(c) (Rev. 2018) (emphasis added) defines a

community hospital as "*any* hospital . . . and/*or related health facilities . . . , including,*

*without limitation, ambulatory surgical facilities . . . established* and acquired *by boards of*

*trustees* or by one or more owners which is governed, operated and maintained by a board of trustees."

¶52. As its name indicates, AS is an "ambulatory surgical facilit[y]." *Id.* AS was "established . . . by [SRHS's] board[s] of trustees" and it is "governed, operated and maintained by [SRHS's] board of trustees." *Id.* As a matter of law, AS squarely fits the statutory definition of a community hospital.

¶53. Despite this, the majority concludes that "[t]he statute governing operations of boards of trustees of community hospitals, on which AS relies, is inapplicable." Maj. Op. ¶ 30. I respectfully disagree. The majority offers little explanation for its ruling. However, I find that AS was a community hospital under Section 41-13-10(c). Further, I find that under Section 41-13-15(4), AS was authorized to "acquire and hold real estate for . . . related health care or support facilities, provided that any contract for the purchase of real property must be ratified by the owner." The owner is the County. Therefore, without the County's ratification, the purchase of the property by AS is void as a matter of law.

> B. *Is that AS was incorporated as a nonprofit Mississippi corporation of legal significance?*

¶54. Pinehaven and First American argue that AS cannot be both a community hospital and a nonprofit corporation.

> 1. *May a community hospital establish a separate entity?*

¶55. As a community hospital, SRHS is authorized to establish AS as a nonprofit corporation and also maintain its status as a community hospital.

¶56.    First, the definition of a community hospital includes several different types of entities and does not limit the particular entities. Miss. Code Ann. § 41-13-10(c). The Legislature defined community hospital intentionally broadly. Indeed, under Section 41-13-10(c), a community hospital is "any hospital, nursing home and/or related health facilities or programs, including, without limitation, ambulatory surgical facilities, intermediate care facilities, after-hours clinics, home health agencies and rehabilitation facilities, established . . ." *Id.* Also, the definition uses the phrase "*without limitation*" and includes a variety of representative facilities and programs that can be community hospitals. *Id.* Thus, it is clear that the definition of a community hospital is not limited, and it actually anticipates and expects the use of separate entities as part of a community hospital.

¶57.    Next, Mississippi Code Section 41-13-35(5)(r) (Rev. 2018) authorized SRHS:

> [t]o establish as an organizational part of the hospital or to aid in establishing as a separate entity from the hospital, hospital auxiliaries designed to aid the hospital, its patients, and/or families and visitors of patients, and when the auxiliary is established as a separate entity from the hospital, the board of trustees may cooperate with the auxiliary in its operations as the board of trustees deems appropriate.

¶58.    Accordingly, a community hospital is statutorily authorized to use nonprofit corporations in a manner that is consistent with legislative purpose of a community hospital. Here, SRHS's chief executive officer, in consultation with the hospital's counsel, determined that the establishment of AS as a nonprofit corporation was the "most appropriate" way for Singing River to acquire and hold its ambulatory surgery interests.

>    2.    *Does the Mississippi Nonprofit Act override, conflict, or repeal the community hospital law?*

16

¶59. No part of the Mississippi Nonprofit Corporation Act overrides, conflicts with, or repeals Section 41-13-10(c)'s definition of a community hospital. Similarly, no part of Section 41-13-10(c) prohibits a community hospital from establishing an ambulatory surgery center through the incorporation of a separate entity as a nonprofit corporation. The community hospital statutes and the nonprofit corporation statutes work together to serve their purpose without conflict or contradiction.

¶60. The fact that AS was incorporated under the general nonprofit corporate statutes did not give AS the unlimited power or authority to purchase property with public funds. Nothing in the definition of a community hospital specifies how a healthcare facility is established. If a healthcare facility meets the definition of a community hospital, then the means by which it is formed cannot remove it from that definition. Otherwise, a community hospital could circumvent the ratification requirement by establishing a nonprofit corporation to make the very same purchase (using the very same public funds) that the board of supervisors had refused to ratify. This Court should reject such an unreasonable reading of the community hospital statutes.

¶61. The majority concludes that the fact that SRHS created AS as a nonprofit corporation somehow excludes it from the community hospital laws or allows this transaction to avoid or escape the governance of the community hospital laws. I find no authority for this conclusion, and the majority provides no authority or explanation.

> 3. *AS was authorized to purchase or acquire property pursuant to statutory requirements.*

17

¶62. The community hospital laws and the nonprofit corporation laws must be read together. Here, SRHS and AS were authorized by Mississippi law to acquire and hold real property:

> Owners and boards of trustees, acting jointly or severally, may acquire and hold real estate for offices for physicians and other health care practitioners and related health care or support facilities, *provided that any contract for the purchase of real property must be ratified by the owner*, and may thereon construct and equip, maintain and remodel or expand such offices and related facilities, and the board of trustees may lease same to members of the hospital staff or others at a rate deemed to be in the best interest of the community hospital.

Miss. Code Ann. § 41-13-15(4) (emphasis added). The Legislature gave the authorization to acquire and hold real estate with a restriction that the owner ratify the agreement. *Id.*

¶63. This case is a prime example that supports the Legislature's reasoning. Under the majority's outcome, a community hospital may take $3.6 million of public funds and escape or evade the oversight of the public entity that actually owns those funds. There was a reason the Legislature required community hospitals to seek ratification of a purchase agreement to acquire and hold real estate. It should be enforced here.

¶64. The Mississippi attorney general has adopted this practical interpretation of the ratification requirement, and recognized that, while a nonprofit entity established by a community hospital is "free to acquire by lease or purchase new real property to be held for the benefit of the hospital, such acquisition [is] subject to ratification by the county board of supervisors, as provided in 41-13-35(5)(o)." Miss. Att'y Gen. Op., No. 2007-00527, 2008 WL 965691, *Delgadillo*, at *1 (Mar. 28, 2008).

18

¶65. This interpretation is also consistent with this Court's decision that a nonprofit entity owned and controlled by a community hospital is an instrumentality of the hospital, afforded the protections of the Mississippi Tort Claims Act, which protects public funds from tort-based losses. ***Bolivar Leflore Med. All., LLP v. Williams***, 938 So. 2d 1222, 1231-32 (Miss. 2006).

       4.      *Equitable estoppel is no defense.*

¶66. Finally, the failure of the owner to ratify the acquisition cannot be overcome by an equitable estoppel defense. *See* ***Singing River MOB***, 2021 WL 5371237, at *10. A board of supervisors must ratify a purchase contract by a formal vote, recorded in the official board minutes. Absent official ratification, the minutes rule prohibits private parties from binding public bodies through estoppel arguments. ***Id.*** This rule is harsh, but this Court has strictly applied it as a matter of public policy, preventing the unauthorized use of public funds that is "paramount to other individual rights which may also be involved." ***Butler v. Bd. of Supervisors for Hinds Cnty.***, 659 So. 2d 578, 579 (Miss. 1995).

¶67. For these reasons, I respectfully dissent. I am of the opinion that Section 41-13-15(4) required SRHS and AS to obtain the ratification of the owner, the County, for the purchase of the property to be a valid purchase. I would reverse the judgment and remand this case for further proceedings.

      **KITCHENS, P.J., AND MAXWELL, J., JOIN THIS OPINION.**